# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### September 27, 2000 Session

## STATE OF TENNESSEE v. KIMBERLY GREENE

### Appeal from the Circuit Court for Blount County
### No. C-10846     D. Kelly Thomas, Judge

### No. E1999-02200-CCA-R3-CD
### February 9, 2001

The defendant appeals from her Blount County Circuit Court conviction and sentence for criminal responsibility for rape of a child, a Class A felony. The trial court sentenced the defendant as a child rapist to 25 years incarceration in the Department of Correction. In this direct appeal, the defendant complains that the videotaped statement she made in response to questioning at the police station should have been suppressed; that the videotaped statement contained inadmissible references to uncharged misconduct; that the cautionary instruction about the evidentiary value of the videotaped statement was inadequate; that her sentence is excessive; and that she should have been sentenced as a Range I, standard offender with a 30 percent release eligibility date. We affirm the defendant's conviction and sentence.

### Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed.

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON and JERRY L. SMITH, JJ., joined.

Charles Dungan, Maryville, Tennessee for the appellant, Kimberly Greene.

Paul G. Summers, Attorney General and Reporter; Mark A. Fulks, Assistant Attorney General; Michael L. Flynn, District Attorney General; Edward P. Bailey, Jr., Assistant District Attorney General; Kirk Andrews, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The defendant, Kimberly Greene, appeals as of right from her Blount County conviction following a jury trial for criminal responsibility for rape of a child, a Class A felony. *See* Tenn. Code Ann. §§ 39-13-522, 39-11-402 (1997). The trial court sentenced the defendant as a child rapist to 25 years incarceration in the Department of Correction. In this appeal, the defendant pursues the following claims:

1.  The trial court erred in failing to suppress the videotape statement of the defendant.

2.  The trial court erred in admitting the videotape statement into evidence as it contained multiple, intertwined references to uncharged misconduct and/or other crimes.

3.  The cautionary instruction given by the trial court on the introduction of the videotape was inadequate as a matter of law.

4.  The sentence rendered by the trial court was excessive and not in compliance with the Sentencing Reform Act.

5.  The trial court erred in failing to include in the judgment of conviction that the defendant was a Range I offender with a 30 percent release eligibility.

We have considered the arguments and briefs of the parties in light of the record before us, and we have studied the applicable law. From that review, we find no reversible error and affirm.

The victim in this case, TM, is the defendant's oldest daughter.[1] At trial, TM testified that in December 1994 she was twelve years old and was living with her stepfather, Steven W. Greene, her younger brother and sister, and the defendant in a house on Madison Avenue in Blount County, Tennessee. The victim, sixteen years old at the time of trial, testified that the defendant woke her up in the middle of the night of December 23, 1994. The defendant told her that the stepfather needed to speak with her, so the victim got out of bed and followed the defendant into the defendant's separate bedroom.

The victim's stepfather was in bed, under the covers. The defendant told the victim to sit down on the bed. The victim resisted at first but then complied when the defendant repeated that she should go ahead and sit down on the bed. The victim said that the stepfather then told her to lie down; the victim did not do so until the stepfather again instructed her to lie down and until the defendant assured her that everything was fine and that she should go ahead.

When TM lay down, the stepfather covered her with a blanket and began touching her thigh. When TM tried to move away from him, the stepfather removed the blanket and turned her sideways on the bed. TM testified that he removed the boxer shorts that she was wearing and threw them in the floor. The defendant, who had been standing at the head of the bed, sat down on the side of the bed. The defendant held TM's head in her lap and also held TM's hand. TM said that the defendant was telling her "that it was okay, not to worry about it."

---

[1] In accordance with this court's policy, the minor victim will be referred to only by her initials.

According to TM, the stepfather removed his underwear, and he tried to position her legs up on his shoulders. TM said that she refused to move whereupon the stepfather pinched her leg. The pinching caused her to loosen up, and when she did the stepfather "kind of shoved his self inside of me." After inserting his penis, the stepfather moved in and out, back and forth. TM said she had never had sex before, and she was crying as the stepfather penetrated her. TM testified that during this time, the defendant was "just rubbing my head and holding my hand and telling me not to think about what was happening, to think about what I was going to get for Christmas."

TM was unsure how long the ordeal lasted, but she testified that when it stopped the stepfather told her to "get out of his face" and that he was "tired of looking at me." TM related that she retrieved her boxer shorts and went into the bathroom. The defendant followed TM into the bathroom. TM was bleeding, and TM stated that the defendant washed TM's face, handed her a pad to wear for the bleeding, and told TM "not to worry about the bleeding, that it would go away in a little while." TM said that she then put on her boxer shorts and went back to bed. The next day, the defendant told TM not to say anything because she would get the defendant in trouble and because then TM's brother and sister would be taken away.

TM remained silent until her freshman year in high school when she told the guidance counselor what had happened. An investigation began immediately and was conducted by Child and Family Services representative Anita Robertson and by Maryville Police Department Detective David Graves. TM, however, did not disclose to anyone that her mother was aware of or had been involved in the December 1994 incident.

TM was examined on September 11, 1997 by a pediatric, emergency room physician at East Tennessee Children's Hospital to determine if there was physical evidence that she had been raped or otherwise sexually abused. The physician testified at trial that TM's hymen was lacerated in two places and that her anus showed evidence of a separate laceration that had healed. The physician could not determine solely from a physical examination the age of these lacerations. The history that TM provided was that she had been forced to have sex with her stepfather from the time she was thirteen years old until approximately August of 1997. TM told the physician that the frequency of the forced sex was "maybe two, three times a week," whenever the stepfather had been drinking. TM never mentioned any involvement by the defendant in connection with having forced sex, and when the physician inquired of the defendant's whereabouts during the sexual encounters, the victim said that her mother was "at work." The physician testified that based on TM's statements and the medical examination, in the physician's opinion the cause of TM's lacerations was blunt force penetrating trauma consistent with TM's accounts of forceful penile penetration against her will.

From August of 1997 until January of 1998, the defendant was not a suspect in the ongoing investigation. Detective Graves considered Steven Greene to be the sole perpetrator. Then in late January of 1998, Detective Graves was contacted by the assistant district attorney general who was involved in the investigation. The assistant district attorney general had interviewed TM recently, and during the interview TM revealed that the defendant was involved in the December 1994 incident. The assistant district attorney general passed along the information to Detective Graves, who then contacted the defendant a day or two later.

Detective Graves testified that he telephoned the defendant on January 28, 1998 and asked her to come to the police department; he did not disclose to her the topic he wanted to discuss. The defendant drove to the Maryville Police Department, and Detective Graves questioned her for about 45 minutes to an hour. He did not advise her of her *Miranda* rights before or during the questioning. Detective Graves conducted the interview in a back office where he videotaped it surreptitiously, without the defendant's knowledge or consent.

At trial, Detective Graves authenticated the videotape, and it was played to the jury.[2] On the videotape, the defendant stated that she remembered one occasion when TM was in the defendant's bedroom. The defendant said that she was present and that her husband had intercourse with TM. TM was upset such that the defendant had to talk to her, hold her hand, and calm her down. Afterwards, the defendant followed TM to the bathroom. The defendant told TM that Steven Greene had threatened her and the children. The defendant noticed that TM was bleeding, and the defendant remained in the bathroom while TM cleaned herself. Also, while being videotaped, the defendant asked questions and made statements about her prior drug use and about Steven Greene having abused another one of her daughters.

For defense at trial, the defendant offered the testimony of three character witnesses who expressed similar opinions that the defendant was a good mother and that she would not allow any harm to come to her children. The defendant was the final witness to testify.

The defendant testified that she has four children. She briefly described a rather tumultuous upbringing and explained that when she met Steven Greene she already had two children, the victim TM and another daughter who was an infant at the time. Both of these children had been removed from the defendant's custody. The defendant testified about behavioral problems with TM that began when TM was in the fourth grade. The defendant claimed that she never had a very good relationship with TM. The defendant focused on intense disagreements with TM that predated allegations of sexual abuse by Steven Greene and which involved a boyfriend much older that TM. The defendant stated that she did not approve of the boyfriend, and she warned TM that she would send her to a Catholic or all-girls school if she continued to see the boyfriend.

After allegations that Steven Greene had sexually abused TM surfaced, he was required to vacate the family residence. With the help of Detective Graves and Ms. Robertson, the defendant later moved to another residence. Soon afterwards, TM went to live with the defendant's sister, and the next oldest daughter went to live with the defendant's brother. The defendant testified that she moved back in with Steven Greene in February of 1998, before she was arrested.

_____

[2] Both the defendant and Steven Greene were arrested and charged with rape of a child. Prior to trial, the state filed a motion, pursuant to *Bruton v. United States*, 391 U.S. 123, 88 S. Ct. 1620 (1968), to sever the cases based on the defendant's statements to Detective Graves, which the state would be seeking to introduce at trial. Although we find no order or ruling in the record granting a severance, the transcripts from the defendant's trial clearly show that Steven Greene was not tried at that time.

Regarding the interview with Detective Graves in January 1998, the defendant testified that the instance when she was in the room while Steven Greene had sex with TM did not happen. She explained that she was "led to say" the things on the videotape, that she feared her two youngest children would be taken from her if she did not cooperate with Detective Graves,[3] and that unless she told the detective what he wanted to hear she would be kept longer at the police station.

The trial court instructed the jury to determine if the defendant was criminally responsible for the rape of the victim, *see* Tenn. Code Ann. §§ 39-11-402, 39-13-522 (1997), and if not, to then consider the lesser-included offenses of facilitation of the rape of the victim, *see* Tenn. Code Ann. § 39-11-403 (1997), criminal responsibility for statutory rape of the victim, *see* Tenn. Code Ann. § 39-13-506 (1997), and facilitation of the statutory rape of the victim. The jury returned a verdict that the defendant was guilty of criminal responsibility for rape of a child.

## I. Suppression of Videotaped Statement

The defendant complains that the trial court should have suppressed her videotaped statement made in response to questioning by Detective Graves at the Maryville Police Department. According to the defendant, Detective Graves subjected her to custodial interrogation without first advising her of her *Miranda* rights. She argues that her statement was unconstitutionally obtained, and thus, the statement should not have been admitted at trial.

Detective Graves surreptitiously videotaped his January 28, 1998 interview with the defendant. The videotape was made an exhibit below, and it is before us on appeal. In addition, Detective Graves testified at the pretrial evidentiary hearing on the defendant's suppression motion. The trial court considered this evidence and denied the motion. We affirm the ruling.

Statements of an accused person "stemming from custodial interrogation" cannot be introduced as evidence unless certain warnings are given to protect a person's privilege against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966). These *Miranda* warnings are necessary only in situations involving custodial interrogation. *See State v. Cooper,* 912 S.W.2d 756, 759 (Tenn. Crim. App. 1995). "Custodial interrogation" is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 86 S. Ct. at 1612; *see State v. Smith*, 868 S.W.2d 561, 570 (Tenn.1993); *Cooper*, 912 S.W.2d at 759.

"In custody" is defined as a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322-23, 114 S. Ct. 1526, 1528-29 (1994); *see State v. Bush*, 942 S.W.2d 489, 499 (Tenn. 1997). The United States Supreme Court has held that it is appropriate to apply an objective test to determine whether a person is in custody and therefore entitled to receive *Miranda* warnings. *See Stansbury*, 511 U.S. at 323, 114 S. Ct. at 1529; *Florida v. Royer*, 460 U.S. 491, 501-02, 103 S. Ct. 1319, 1326 (1983). Courts look

---

[3] By the time she went to trial, the defendant had lost custody of these two children.

to the totality of the circumstances of the interrogation and inquire "how a reasonable [person] in the suspect's position would have understood [the] situation." *Berkemer v. McCarty*, 468 U.S. 420, 422, 104 S. Ct. 3138, 3151 (1984); *see also Stansbury*, 511 U.S. at 323-24, 114 S. Ct. at 1529.

In *State v. Anderson*, 937 S.W.2d 851, 855 (Tenn. 1996), the Tennessee Supreme Court adopted this objective analysis and recognized several nonexclusive factors to aid in the assessment of whether a reasonable person would consider himself deprived of freedom of movement to a degree associated with a formal arrest. Relevant factors include the following: the time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will. *See id.* As these factors indicate, the determination is fact specific.

As support for the claim that she was "in custody" at the time Detective Graves questioned her, the defendant argues that her presence was obtained by subterfuge, that the detective lied to her about the purpose of the interview and about whether she was being tape recorded, that the detective did not confront the defendant with his suspicions or evidence of guilt until well into the interview, that during the interview the detective equivocally couched the victim's allegations in terms of the need to help her children, that the detective told the defendant she was not in trouble, and that the defendant communicated to the detective that being taken to the back room in the police department felt like she was under arrest. These arguments are not persuasive.

It is settled that police officers are not required to give *Miranda* warnings simply because the interview or the questioning is conducted at the police station. *See, e.g.*, *California v. Beheler*, 463 U.S. 1121, 103 S. Ct. 3517 (1983); *Oregon v. Mathiason*, 429 U.S. 492, 97 S. Ct. 711 (1977); *Cooper*, 912 S.W.2d at 760-62; *Smith*, 868 S.W.2d at 569-71. It is likewise settled that whether the interrogating officers have focused their suspicions on the person being interviewed is irrelevant for purposes of *Miranda*. *See, e.g.*, *Stansbury*, 511 U.S. at 325, 114 S. Ct. at 1530 ("an officer's evolving but unarticulated suspicions do not affect the objective circumstances of an interrogation or interview, and thus cannot affect the *Miranda* custody inquiry"); *State v. Brown*, 836 S.W.2d 530, 546 n.11 (Tenn. 1992); *Cooper*, 912 S.W.2d at 765-66.

In this case, the defendant's statement to Detective Graves was not unconstitutionally obtained. The defendant came voluntarily to the Maryville Police Department, and Detective Graves informed her that she was not under arrest. After approximately 45 minutes to an hour she left the police department without being detained. Neither Detective Graves's suspicions about the defendant nor any desire he might have had to elicit an admission from the defendant converted the interview into a custodian interrogation. From these facts, the defendant was not "in custody" for *Miranda* purposes, and the trial court correctly denied the suppression motion.

The defendant suggests, with little discussion, that notwithstanding the issue of custody for *Miranda* purposes, the interview with Detective Graves was fundamentally unfair. For the same reasons that lead us to conclude that the defendant was not "in custody," we do not believe that her statements to the detective were involuntary or that any due process violation occurred.

## II. Uncharged Misconduct and Cautionary Instruction

Our ruling that the defendant's motion to suppress was properly denied does not complete our inquiry concerning the videotape. It remains for us to consider whether the videotaped statement should have been excluded, in whole or in part, because it contained intertwined references to uncharged misconduct.

The passages in the defendant's statement to which she objects fall into two general categories: comments about the defendant's drug usage and references to rape or other forms of sexual abuse committed by Steven Greene against another one of the defendant's daughters. The basis of the defendant's argument can adequately be gleaned from the following excerpts from the tape.

**Detective Graves:** You were under a lot of pressure. I – you know – you were living in his house. Okay?

**Ms. Kim Greene:** Well, I was doing drugs, which I shouldn't have, but I remember, Stephen was little and it was before Christmas – a week, I'm wanting to think, before Christmas.

\* \* \* \* \* \* \* \* \* \*

**Detective Graves:** – you know, it's happened to these girls and that's why I want to –

**Ms. Kim Greene:** Well, see, I couldn't believe it about [other daughter] till – uh, well, Ms. Robertson showed – told me there was abuse there. That was it. I didn't know anything about –

**Detective Graves:** There was good physical medical evidence there. You know, he's done it to these girls.

**Ms. Kim Greene:** Yeah.

**Detective Graves:** There's no –

**Ms. Kim Greene:** It's backed by medical records.

* * * * * * * * * *

**Ms. Kim Greene:** What about my drug use?

**Detective Graves:** I don't care.  That's doesn't matter.

**Ms. Kim Greene:** That looks bad with me taking care of two of the
kids.

We do not understand that the state disputes seriously or quibbles with the defendant's characterization of these statements as referring to uncharged misconduct.  We agree that drug use and sexual abuse are crimes, wrongs, or other acts, and if not prosecuted, they are "uncharged" misconduct.  The state's position appears to be fourfold.  First, as long as Detective Graves did not accuse the defendant of a crime relating to her drug use or sexual abuse of another child, then the statements are admissible.  Second, because the discussion of drugs and about other sexual abuse was initiated by the defendant, not the detective, the statements are admissible.  Third, the defendant's statements about drug usage were part and parcel of her confession because she was trying to mitigate her responsibility.  Last, since the detective and the defendant were discussing Steven Greene's conduct as it related to sexual abuse of another child in the home, the statements are admissible.

We begin with the relevant evidentiary rules, principles, and standard of appellate review.  Generally speaking, character evidence is inadmissible to prove action in conformity with the character or trait on a particular occasion.  Tenn. R. Evid. 404(a).  Character evidence, however, may be admissible for other purposes if it is relevant and has probative value which is not substantially outweighed by unfair prejudice.  Tenn. R. Evid. 401, 403.  The standard of review applicable to a decision to admit evidence is abuse of discretion.  *See State v. Dubose*, 953 S.W.2d 649, 652 (Tenn. 1997); *State v. Baker*, 785 S.W.2d 132, 134 (Tenn. Crim. App. 1980).  When the evidence falls within Rule 404(b), the standard of review is the same provided that the trial judge has substantially complied with the procedural requirements of the rule.  *See Dubose*, 953 S.W.2d at 652.  If, however, the trial judge does not substantially comply with the procedural requirements of Rule 404(b), then no deference is given to the trial judge's decision.  *Id*.

In order for prior crimes, wrongs or acts to be admitted, Rule 404(b) specifies three prerequisites:

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and,

> (3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). A fourth prerequisite to admission is that the court find by clear and convincing evidence the defendant committed the prior crime. Tenn. R. Evid. 404, Advisory Comm'n Comment; *DuBose*, 953 S.W.2d at 654; *State v. Parton*, 694 S.W.2d 299, 303 (Tenn. 1985).

The trial court conducted a hearing outside the jury's presence; however, it neither determined that a material issue other than conduct conforming with a character trait of the defendant existed, nor did the trial court state the material issues, its ruling, and its reasons for admitting the evidence on the record. Tenn. R. Evid. 404(b)(2). Indeed, the trial court made no findings or ruling at all regarding the defendant's drug usage. Also, the trial court did not assess the probative value of the evidence versus the danger of unfair prejudice from its admission. Instead, relying on its recollection from having previously viewed the video tape, the trial court noted that it did remember Detective Graves talking about more than one child and about acts committed by Steven Greene, "but I don't remember any that were asking her directly at all about any other acts of hers other than it was just a general thing about telling him about everything to protect the children, which I don't think is a problem." In effect, the trial court did not consider admissibility of the evidence as a Rule 404(b) issue, and presumably for that reason, it did not follow the procedural requirements of the rule. Consequently, we decline to apply the abuse-of-discretion standard of review.

Concerning use of drugs, the defendant admitted in her statement, "I was doing drugs." Therefore, no real question is presented whether her drug use really occurred. The evidence, we find, clearly and convincingly established that fact. Nevertheless, we do not discern how the defendant's drug use was relevant to a material issue in the case. At trial, the state merely trivialized the interjection of drugs into the prosecution and argued its lack of effect. That approach ignores the requirement that the evidence first must be relevant to a material issue before its prejudicial effect is gauged, unless, of course, the state on appeal actually is conceding the error of admitting the drug evidence and is essentially arguing the harmlessness of that error.

Even on appeal, the state does not specifically suggest how the evidence relates to any material issue. Whether or not the defendant initiated the discussion about drugs and whether or not the detective directly accused her of committing a criminal offense do not generate or lend probative value to support admissibility. The state cites no authority for admitting evidence of uncharged misconduct on these grounds, and we have found none. Equally unpersuasive is the notion that the defendant's drug use is relevant because the defendant tried to mitigate her responsibility on that basis. Rule 404(b) allows evidence of other crimes when it is relevant "*to a litigated issue*, such as identity . . . and its probative value is not outweighed by the danger of unfair prejudice." *State v. Hayes*, 899 S.W.2d 175, 183 (Tenn. Crim. App. 1995) (emphasis added). In this case, the defense theory was that the defendant did not assist in the rape of TM and that she lied to Detective Graves because she felt pressured. She did not admit involvement in the rape and try to negate her intent or otherwise mitigate her responsibility by claiming she was under the influence of drugs. Consequently, we believe that evidence of the defendant's drug use was erroneously admitted at trial.

Next we turn to the detective's and the defendant's statements concerning sexual abuse by Steven Greene of another child in the home. The state made the argument to the trial court that the defendant was not charged or accused of any offense involving the other child. We do not agree that this sexual abuse is misconduct reflecting only upon Steven Greene, such that Rule 404(b) does not apply.

We disagree because uncharged misconduct of a third party may well reflect negatively on the character of an accused and may be evidence of other crimes, wrongs, or acts of the accused as well as a third party. The situation in this case is such an example. Evidence that the defendant's husband had repeatedly sexually abused not one, but two, of the defendant's daughters certainly qualifies as crimes, wrongs, or acts by Steven Greene. That same evidence serves double duty because it also circumstantially proves that the defendant failed to intervene on behalf of her daughters or take some action calculated to stop her husband's sexual abuse of the girls. Consequently, we believe that the trial court erred in failing to evaluate this evidence according to the strictures of Rule 404(b).

Our review of the evidence from a Rule 404(b) perspective generates reservations whether the detective's and the defendant's discussion about abuse of another child meets the clear and convincing evidence standard. Neither Steven Greene nor the other daughter testified in, or outside, the presence of the jury. The defendant refers to some medical records and to being told by Ms. Robertson that there was abuse, but the records were not introduced, and Ms. Robertson did not testify.

Even assuming that the statements rise to the level of clear and convincing evidence that abuse of another daughter occurred, the problem of relevancy to some material issue remains. As with the defendant's drug use, we are pressed to conclude that the abuse is relevant to some material issue involved in the defendant's trial. Failure to intervene or protect her daughters from sexual abuse does not assist in establishing the defendant's identity, her motives, her intent, lack of accident or mistake, or some common scheme or plan related to the charged offense.

For all of the above reasons, we conclude that the trial court erred when it admitted the evidence of drug use and other sexual abuse. The question which remains is what effect the erroneous admission of this evidence had on the jury. We are not convinced that the error affirmatively appears to have affected the result of the defendant's trial. *See* Tenn. R. Crim. P. 52(a). Consequently, we hold that the error is harmless.

At trial, TM provided the jury with a detailed account of being raped by her stepfather during the Christmas holidays in 1994 and of the defendant's involvement and participation in that abhorrent event. TM specifically recalled the defendant "rubbing my head and holding my hand and telling me not to think about what was happening, to think about what I was going to get for Christmas." Additionally, the medical evidence in this case established conclusively that TM had been subjected to forceful penile penetration against her will.

During her January 1998 interview with Detective Graves, the defendant then corroborated her daughter's testimony and bolstered her daughter's credibility. The state introduced the defendant's own admission to Detective Graves that she was present in the bedroom when her husband had sexual intercourse with TM. The defendant recalled that TM was upset and that she had to talk to TM, hold her hand, and calm her down. Both TM and the defendant remembered going to the bathroom afterwards and discovering that TM was bleeding.

The defendant's videotaped confession was a powerful piece of evidence, and we are convinced that the state had a particularly strong case for the defendant's guilt. By contrast, the defendant offered a weak theory of defense. She relied on three character witnesses who vouched for her good parenting skills, and she then denied to the jury that there ever was a time when she was in the bedroom while her husband had sex with TM. The defendant's only explanation for her incriminating statements to Detective Graves was that he "led" her to say the things she did and that she felt pressured to cooperate so she could keep her two youngest children and so she could leave the police station. This explanation was not otherwise substantiated, and the videotape of the interview belied its efficacy.

Against this background, the erroneous admission of evidence of drug use and other sexual abuse is not sufficiently powerful to vibrate the defendant's conviction from its moorings. The defendant addressed the negative features of the evidence by offering testimony at trial of her character for being a good mother and for not allowing any harm to come to her children. Furthermore, we have viewed and listened to the videotape of the defendant's interview, which was played for the jury. The mention of drug use and other sexual abuse is relatively brief, and it is doubtful that the jury comprehended everything that the defendant said during the interview. Some of her statements are too faint to hear, and some are essentially unintelligible. Without being alerted in advance to listen for comments about drug use and other sexual abuse, someone reviewing the videotape easily could miss them.

We are mindful, as the defendant has pointed out, that the jury was not instructed on how to receive and use the evidence of her drug use and other episodes of sexual abuse. The trial court instructed the jury only that it should not consider the questions posed by the detective on the videotape as evidence; the instruction was a correct, albeit incomplete, statement of law. The jury, though, was not affirmatively misled regarding applicable legal principles, and the failure to otherwise instruct does not alter our opinion about the effect of the error.

For all of these reasons, we conclude that the error in admitting the evidence about drug use and other sexual abuse was harmless.

Before leaving this issue, we believe that it is appropriate to comment on one other matter. There was a noticeable undercurrent in this case that editing or redacting the videotape of the defendant's statements was too much trouble; therefore, as long as the objected to material was relatively innocuous, no harm would result from playing the entire videotape. We do not endorse this all-or-nothing approach. At least five options for handling the defendant's videotaped statements were available. The state could have made a redacted copy of the videotape that focused on the

relevant portions of the interview; the state could have queued the tape to the relevant part of the interview and played only that portion for the jury; the state could have prepared a transcript of the relevant passages and offered that transcript as an exhibit; the state could have had the detective himself relate what the defendant told him during that interview, which was relevant to the case; or the state could have used the audiotape recording that was made, with the defendant's knowledge, during the surreptitiously videotaped interview. The audiotaped statements were essentially free of the taint about which the defendant now complains. Any one of these options could have advanced the state's case and minimized the risk of a new trial.

## III.  Sentencing

The defendant raises two sentencing claims. She asks that her twenty-five year sentence be reduced to twenty years. She also submits that she should have been sentenced as a Range I offender with a 30 percent release eligibility date instead of as a child rapist, which mandates 100 percent service.

## A.  Excessive Sentence

The defendant's claim that her sentence is excessive rests on the notion that a malfunction of the official court reporter's equipment has resulted in an incomplete transcript of her sentencing hearing. According to the defendant, the parts omitted from the transcript include favorable testimony of her brother. The defendant does not otherwise challenge the length of her sentence, and she concedes that the trial court in her case correctly followed the sentencing procedures in Code section 40-35-210. *See* Tenn. Code Ann. § 40-35-210 (Supp. 2000.)

Even though the defendant is not at fault for the incomplete sentencing hearing transcript, the remedy is not to reduce her sentence. The defendant, as the party complaining about the sentence, still has the burden of establishing that the trial court imposed an improper sentence. Appellate Rule 24 covers the situation with which the defendant is confronted. Rule 24 provides in pertinent part,

> (c) Statement of the Evidence When No Report, Recital, or Transcript Is Available. – If no stenographic report, substantially verbatim recital or transcript of the evidence or proceedings is available, the appellant shall prepare a statement of the evidence or proceedings from the best available means, including the appellant's recollection. The statement should convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal. The statement, certified by the appellant or the appellant's counsel as an accurate account of the proceedings, shall be filed with the clerk of the trial court within 90 days after filing the notice of appeal.

Tenn. R. App. P. 24(c).

Absent the necessary relevant material in the record we cannot consider the merits of defendant's claim. *See, e.g.*, *State v. Troutman*, 979 S.W.2d 271 (Tenn. 1998); *State v. Ballard*, 855 S.W.2d 557 (1993). The issue has been waived.

## B. Child Rapist Sentencing

The defendant further claims that because the conviction offense occurred before July 1, 1995 she is entitled to a release eligibility date and should have been sentenced as a Range I offender with a thirty percent release eligibility date.

The defendant rests her argument on Code section 40-35-501 dealing with release eligibility status. Subsection (i)(1) of Code section 40-35-501 states in relevant part, "There shall be no release eligibility for a person committing an offense, on or after July 1, 1995, that is enumerated in subdivision (2)." Subdivision (2) includes the offense of child rape. "Such person," the statutory subsection continues, "shall serve one hundred percent (100%) of the sentence imposed by the court less sentence credits earned and retained." By negative implication, the defendant argues that she is entitled to release eligibility because her offense was committed in 1994. We reject this argument.

In 1991, the legislature passed a public act to add the criminal offense of child rape to Title 39 of the Code. Because the constitutionally-required first year's funding was not appropriated during the 1991 legislative session, however, the public act was not codified at that time. *See* Tenn. Const. art. II, § 24; Tenn. Code Ann. § 39-13-522 code commission notes (1991). Codification was delayed until 1992, at which time child rape became a separate crime. Tenn. Code Ann. § 39-13-522 (Supp. 1996). A companion statute was enacted at the same time, and it addressed sentencing, release, and parole for child rapists. Tenn. Code Ann. § 39-13-523 (Supp. 1996). That statute provides in pertinent part:

> (b) Notwithstanding any other provision of law to the contrary, . . . a child rapist, as defined in subsection (a), shall be required to serve the entire sentence imposed by the court undiminished by any sentence reduction credits such person may be eligible to earn. . . .

> (c) The provisions of title 40, chapter 35, part 5, relative to release eligibility status and parole shall not apply to or authorize the release of a multiple rapist or child rapist, as defined in subsection (a), prior to service of the entire sentence imposed by the court.

Code section 40-35-501(i)(1), upon which the defendant relies, was not enacted until 1995. In construing this statute, we must "presume that the legislature has knowledge of its prior enactments and knows the state of the law at the time it passes legislation." *State v. Levandowski*, 955 S.W.2d 603, 604 (Tenn. 1997). Nothing in section 40-35-501(i)(1) indicates a legislative intent to modify the preexisting command of section 39-13-523(b) or (c) that a child rapist is required to serve the entire sentence imposed. Furthermore, any residual doubt is dispelled in light of the

legislative pronouncement in Code section 40-35-501(i)(3) that subsection (i) is not to be construed as "affecting, amending or altering the provisions of §39-13-523."

The legislative intent that a child rapist serve 100 percent of the sentence imposed, we believe, is clear, and it defeats the defendant's argument. *See State v. Hodges*, 944 S.W.2d 346, 354 (Tenn. 1997).

## IV.  Conclusion

Based on our careful review of the record, we conclude that the defendant was fairly tried and convicted and that she was lawfully sentenced.  We, therefore, affirm.

_____
JAMES CURWOOD WITT, JR., JUDGE